In the

# UNITED STATES COURT OF APPEALS
### for the Seventh Circuit

# No. 23-2404

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**OLALEKAN JACOB PONLE,**

**Defendant-Appellant.**

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 20 CR 318 — Hon. Robert W. Gettleman, *Judge.*

## BRIEF OF THE UNITED STATES

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

MORRIS PASQUAL
Acting United States Attorney
for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

GEORGIA N. ALEXAKIS
Assistant United States Attorney
Chief of Appeals, Criminal Division

MELODY LAKE WELLS
Assistant United States Attorney

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................iii

JURISDICTIONAL STATEMENT ................................................................ 1

ISSUES PRESENTED FOR REVIEW .......................................................... 1

STATEMENT OF THE CASE ...................................................................... 2

*Offense Conduct* ..................................................................................... 2

*Indictment and Guilty Plea* .................................................................. 5

*Sentencing* ............................................................................................. 6

    *Presentence Investigation Report* ...................................................... 6

    *Parties' Sentencing Memoranda* ........................................................ 7

    *Sentencing Hearing* ............................................................................ 8

SUMMARY OF ARGUMENT ..................................................................... 10

ARGUMENT ................................................................................................ 11

    I.    The District Court Did Not Err in Calculating Defendant's
          Guidelines Range Using Intended Loss. .......................................... 11

        A.    Standard of Review ...................................................................... 11

        B.    Analysis ........................................................................................ 12

            1.    This Court's Precedent Directs Sentencing Courts to
                 Consider Intended Loss When Calculating a Defendant's
                 Guidelines Range. ....................................................................... 12

            2.    The District Court Did Not Err in Calculating Defendant's
                 Guidelines Range Based on Intended Loss. ................................ 18

               a.    Under Guideline § 2B1.1, "Loss" Is Not Unambiguously
                    Limited to "Actual Loss." .......................................................... 19

b.   Application Note 3(A) Satisfies the Remaining Criteria Warranting Deference Under *Kisor*. ........................................ 28

II.   The District Court Did Not Err in Calculating Defendant's Guidelines Range After Applying a Two-Level Enhancement Under Guideline § 2B1.1(b)(2)(A). .................................................. 31

A.   Standard of Review ........................................................... 31

B.   Analysis ........................................................................ 31

III.  In Any Event, Any Guidelines-Calculations Error Was Harmless Where the District Court Selected Defendant's Sentence Based on the § 3553(a) Factors. ........................................ 33

CONCLUSION ................................................................................. 35

# TABLE OF AUTHORITIES

## CASES

*Auer v. Robbins*, 519 U.S. 452 (1997) .................................................. 14, 15, 17

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945)...................... 13, 14

*Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 233 F.3d 981 (7th Cir. 2000) ................................................................. 21

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ......................................*passim*

*Maracich v. Spears*, 570 U.S. 48 (2013).......................................... 27

*Mistretta v. United States*, 488 U.S. 361 (1989)................................ 30

*Moses v. United States*, No. 22-163, WL 17155762 (Nov. 21, 2022)............... 15

*Ratzloff v. United States*, No. 23-310, WL 8481953 (Dec. 6, 2023) ................ 15

*Stinson v. United States*, 508 U.S. 36 (1993)............................................*passim*

*United States v. Abbas*, 560 F.3d 660 (7th Cir. 2009)............................... 33, 34

*United States v. Adams*, 934 F.3d 720 (7th Cir. 2019) ................................... 16

*United States v. Alford*, 3:21CR052, 2022 WL 19406808 (N.D. Fla. Aug. 22, 2022)........................................................................... 26

*United States v. Alford*, No. 3:21CR052, 2022 WL 3577373 (N.D. Fla. Aug. 20, 2022)........................................................................... 26

*United States v. Alhalabi*, 443 F.3d 605 (7th Cir. 2006) ................................ 32

*United States v. Alvarez-Carvajal*, 2 F.4th 688 (7th Cir. 2021) ..................... 33

*United States v. Baker*, 56 F.4th 1128 (7th Cir. 2023)................................... 33

*United States v. Banks*, 55 F.4th 246 (3d Cir. 2022) .......................... 25, 26, 27

*United States v. Black*, 815 F.3d 1048 (7th Cir. 2016) ................................... 24

*United States v. Blake*, 965 F.3d 554 (7th Cir. 2020) .................................... 12

*United States v. Campbell*, 22 F.4th 438 (4th Cir. 2022) ............................... 17

*United States v. Castillo*, 69 F.4th 648 (9th Cir. 2023) ................................... 17

*United States v. Chavin*, 316 F.3d 666 (7th Cir. 2002) ................................... 24

*United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) ............................... 17

*United States v. Durham*, 967 F.3d 575 (7th Cir. 2020) ................................. 33

*United States v. Elizondo*, 21 F.4th 453 (7th Cir. 2021) ................................ 12

*United States v. Griffin*, 76 F.4th 724 (7th Cir. 2023) ............................ 11, 31

*United States v. Kirilyuk*, 29 F.4th 1128 (9th Cir. 2022) ............................... 20

*United States v. LaFaive*, 618 F.3d 613 (7th Cir. 2010) ................................ 19

*United States v. Limbaugh*, No. 21-4449, 2023 WL 119577 (4th Cir. Jan. 6, 2023) ................................................................................................................ 17

*United States v. Lomax*, 51 F.4th 222 (7th Cir. 2022) .................................... 16

*United States v. Lovies*, 16 F.4th 493 (7th Cir. 2021) .................................... 33

*United States v. Maloid*, 71 F.4th 795 (10th Cir. 2023) ........................... 16, 17

*United States v. Mei*, 315 F.3d 788 (7th Cir. 2003) .................................. 12, 29

*United States v. Moses*, 23 F.4th 347 (4th Cir. 2022) ................................... 17

*United States v. Nasir*, 17 F.4th 459 (3d Cir. 2021) ..................................... 17

*United States v. Pace*, 48 F.4th 741 (7th Cir. 2022) ..................................... 27

*United States v. Phillips*, 54 F.4th 374 (6th Cir. 2022) ................................. 21

*United States v. Reaves*, 796 F.3d 738 (7th Cir. 2015) .................................. 25

*United States v. Riccardi*, 989 F.3d 476 (6th Cir. 2021) .......................... 17, 20

*United States v. Shabani*, 513 U.S. 10 (1994) ............................................... 27

*United States v. Smith*, 989 F.3d 575 (7th Cir. 2021) .................................... 16

*United States v. Taylor*, 627 F.3d 674 (7th Cir. 2010) ................................... 25

*United States v. Turchen*, 187 F.3d 735 (7th Cir. 1999) ................................ 19

*United States v. Vargas*, 74 F.4th 673 (5th Cir. 2023) .................................... 16

*Voisine v. United States*, 579 U.S. 686 (2016) ................................................. 24

## STATUTES

18 U.S.C. § 1028(d)(7) .................................................................................. 32

18 U.S.C. § 1029(e)(1) .................................................................................. 32

18 U.S.C. § 1343 ....................................................................................... 1, 5

18 U.S.C. § 3231 ............................................................................................ 1

18 U.S.C. § 3553(a) ...................................................................... 10, 11, 33, 34

18 U.S.C. § 3742(a) ........................................................................................ 1

28 U.S.C. § 1291 ............................................................................................ 1

## SENTENCING GUIDELINES

U.S.S.G. § 1B1.3 .............................................................. 23, 24, 25, 26

U.S.S.G. § 2B1.1 .............................................................................. *passim*

U.S.S.G. § 2B1.4(b)(1) .............................................................................. 24

U.S.S.G. § 2F1.1(b)(1) (1987) ..................................................... 22, 25, 30

## JURISDICTIONAL STATEMENT

Defendant-Appellant's jurisdictional statement is not complete and correct. Defendant was charged with wire fraud in violation of 18 U.S.C. § 1343. R. 10.[1] Defendant pled guilty to that offense and was sentenced by the district court on July 11, 2023. R. 66, 76. The district court's judgment and sentencing order was entered on the docket that same day. R. 78. Defendant filed a timely notice of appeal on July 17, 2023. R. 81.

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## ISSUES PRESENTED FOR REVIEW

1.     Whether the district court improperly calculated defendant's Guidelines range by relying on an agreed-upon estimate of intended loss rather than the actual loss caused by defendant's scheme to defraud.

2.     Whether the district court erred in determining that defendant's criminal activity involved 10 or more victims and therefore warranted a two-level increase in offense level under Guideline § 2B1.1(b)(2)(A).

---

[1] Citations to the original electronic record on appeal are designated as "R." followed by the district court document number. Citations to defendant's brief are designated as "Br." followed by the page number. Citations to the Presentence Investigation Report are designated as "PSR" followed by the paragraph number. Citations to the government's appendix (which includes the sentencing hearing transcript) are designated as "G. App." followed by the page number.

## STATEMENT OF THE CASE

*Offense Conduct*

From at least January 2019 until September 2019, defendant Olalekan Jacob Ponle, using the alias "Mark Kain," worked with co-schemers to engage in numerous "business email compromise" schemes to defraud companies based in the United States. R. 67 at 1-2; PSR ¶ 7. Defendant's schemes resulted in millions of dollars in actual losses and tens of millions of dollars in attempted losses to the victim companies. PSR ¶ 7.

To execute his fraud, defendant worked with co-schemers who compromised email accounts belonging to victim companies through the use of phishing links. R. 67 at 3; PSR ¶ 8.[2] The co-schemers used their unauthorized access to the compromised email accounts to send emails that were purportedly from the victim companies in order to divert legitimate payments to or from the victim companies to bank accounts controlled by defendant. R. 67 at 3-4; PSR ¶ 8. Defendant, who lived in Dubai, United Arab Emirates, at the time of scheme, had recruited "money mules" based in the United States to open bank accounts in the names of victim companies. PSR ¶¶ 7-8; *see also* R. 67 at 2-3. As a result, in response to false wiring instructions that defendant caused to

---

[2] Phishing is the fraudulent practice of sending emails or other messages purporting to be from a legitimate sender in order to induce individuals to reveal personal information, such as passwords and credit card numbers.

be sent to victim companies, the proceeds from those wires, ranging from hundreds of thousands of dollars to millions of dollars, were sent by unwitting employees at the victim companies to bank accounts that had been opened by money mules at defendant's direction. PSR ¶ 9; R. 67 at 3-4. Defendant further instructed the money mules to convert those proceeds to Bitcoin and to send the proceeds to a Bitcoin wallet that defendant controlled. PSR ¶ 9; R. 67 at 4.[3]

On some occasions, multiple fraudulent emails were sent by co-schemers to a victim company to induce it to send additional wire transfers to the accounts opened at defendant's direction. PSR ¶ 11. Some victim companies detected the fraud and were able to reverse the wire transfers or recover the funds after the wires were sent. *Id.* Other times, victim companies determined the wire transfer request was fraudulent before the wire was executed; therefore, no funds were sent. *Id.* Sometimes, the bank account opened by the money mule was closed by the bank for fraud; therefore, the wire transaction failed. *Id.* In addition, during the scheme, defendant communicated with an FBI online covert employee who he directed to open bank accounts in the

---

[3] Bitcoin is a type of cryptocurrency, or virtual currency. Bitcoin is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Bitcoin transactions are recorded in the Bitcoin blockchain. The blockchain is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every bitcoin transaction. Bitcoin is stored in "wallets," which can be either hardware- or software-based. R. 10 at 2.

names of companies in the United States in order to receive wire transfers at those accounts and then to transfer any funds sent to those accounts to defendant's Bitcoin wallet. PSR ¶ 12.

Defendant's schemes caused the following (uncontested) actual and intended losses to 12 victim companies:

| Victim Company | Actual Loss | Intended Loss |
|---|---|---|
| Victim Company A | $2,300,000 | N/A |
| Victim Company B | $1,270,645 | $972,000 |
| Victim Company C | $350,000 | $151,500 |
| Victim Company D | N/A | $434,000 |
| Victim Company E | $1,955,000 | N/A |
| Victim Company G | $1,044,569 | $1,606,430 |
| Victim Company H | $1,000,000 | $1,000,000 |
| Victim Company I | N/A | $1,206,418 |
| Victim Company J | N/A | $2,499,083 |
| Victim Company K | N/A | $19,268,000 |
| Victim Company L | N/A | $4,999,250 |
| Victim Company M | $118,000 | $19,173,879 |
| **Total** | **$8,038,214** | **$51,310,561** |

PSR ¶ 12.

Finally, in addition to recruiting and managing money mules and receiving the fraudulent proceeds, defendant personally logged into victim email accounts without authorization. PSR ¶ 10. Defendant obtained unauthorized access to victim accounts using credentials he purchased online.

4

*Id*. Defendant purchased at least 800 such credentials, logged in to approximately 300 victim accounts, and used his access to induce fraudulent wire transfers. *Id*. Through this scheme, he successfully received victim funds about 30% of the time. *Id*.

### *Indictment and Guilty Plea*

On July 15, 2020, a grand jury returned an indictment charging defendant with eight counts of wire fraud, in violation of 18 U.S.C. § 1343. R. 10.

On April 6, 2023, defendant pled guilty to Count One of the indictment pursuant to written plea declaration. R. 66-67. In the factual basis to that plea declaration, defendant acknowledged that he engaged in a scheme to defraud Victim Company B. R. 67 at 1. More specifically, defendant admitted that his co-schemers obtained unauthorized access to a Victim Company B email account and used that access to direct a $188,191 wire payment from Victim Company B, intended for one of Victim Company B's suppliers, to a bank account opened at defendant's direction by a money mule. *Id*. at 1-2.

In his plea declaration, defendant further acknowledged that he owed $8,038,214 (the actual loss figure reflected above) in restitution to the victim companies. R. 67 at 4. He also agreed to forfeit approximately 151 bitcoin that he obtained through his schemes. *Id*. at 5.

*Sentencing*

*Presentence Investigation Report*

Before sentencing, U.S. Probation prepared a Presentence Investigation Report that calculated defendant's total offense level as 36. PSR ¶ 36. Pertinent to this appeal, U.S. Probation determined that defendant's offense level should be increased by 22 levels, noting that, under the Guidelines commentary to Guideline § 2B1.1, "loss" is the greater of actual or intended loss. PSR ¶ 25 (citing Guideline § 2B1.1, Application Note 3(A)). Because defendant's offense involved an intended loss of more than $51 million (more than $25 million but less than $65 million), under Guideline § 2B1.1(b)(1)(L), a 22-level increase in offense level was warranted. PSR ¶ 25. (By comparison, the actual-loss figure of approximately $8 million would have required an 18-level increase in offense level under Guideline § 2B1.1(b)(1)(J).)

Also pertinent to this appeal, U.S. Probation determined that defendant's offense involved 10 or more victims and therefore warranted a 2-level increase in offense level under Guideline § 2B1.1(b)(2)(A)(i). PSR ¶ 26. Probation gave two reasons for this determination. First, it explained that defendant's business email compromise scheme involved 12 victim companies, seven of which suffered actual losses. *Id.* Second, it explained that defendant personally logged into approximately 300 victim accounts using credentials he purchased online, used his access to induce fraudulent wire transfers, and

proved successful in doing so approximately 30 percent of the time. *Id.* Thus, through this separate aspect of his criminal activity, defendant's offense involved more than 10 victims. *Id.*

With a total offense level of 36, and a criminal history category of I (PSR ¶ 41), U.S. Probation calculated defendant's advisory Guidelines range to be 188 to 235 months of imprisonment (PSR ¶ 78).

### Parties' Sentencing Memoranda

In its sentencing memorandum, the government agreed with the facts and Guideline calculations set forth in the PSR. R. 70 at 3; *see also* R. 73. It recommended a below-Guidelines sentence of 168 months, noting that after his arrest, "defendant facilitated the return of over 151 Bitcoin in fraudulent proceeds." R. 70 at 1, 3-4, 9.

In his sentencing memorandum, defendant did not challenge the facts set forth in the PSR, including the calculations of actual and intended loss. R. 72 at 3-5. Nor did he challenge the entry of a restitution order reflecting the actual loss amount of $8,038,214. *Id.* Instead, defendant relied on *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), to argue that the district court should use only actual loss, not intended loss, to calculate the proper offense level under Guideline § 2B1.1(b). *Id.* Defendant also argued that his offense did not involve 10 or more victims because only seven victim companies suffered actual losses through his business email compromise scheme. *Id.* at 5. As a result, defendant

7

maintained that the two-level enhancement under Guideline §2B1.1(b)(2)(A)(i) did not apply. *Id.*

### Sentencing Hearing

Defendant was sentenced on July 11, 2023. R. 76. At the hearing, with respect to the Guidelines calculations, the parties advanced positions consistent with their sentencing memoranda. *See generally* G. App. 1-36 (sentencing hearing transcript).

With respect to loss amount, the district court rejected defendant's argument that loss for purposes of Guideline § 2B1.1 should be calculated using only actual, not intended, loss. G. App. 3-5. The district court noted that defendant's argument was based on caselaw contrary to this Court's precedent. *Id.* at 5. The district court thus concluded that because the intended loss related to defendant's criminal conduct was greater than $25,000,000, his offense level increased by 22 levels pursuant to Guideline § 2B1.1(b)(1)(L). *Id.*

With respect to the number of victims, the district court agreed with the government's position that defendant had acknowledged using means of identification (namely, email credentials) of at least 10 individuals. G. App. 5-7 (prosecutor told the court that defendant has "acknowledged that he personally gained unauthorized access to over 300 accounts and for approximately 100 of those made some money off of it"; defendant does not

8

contest that representation). As a result, the court applied the two-level enhancement called for by Guideline § 2B1.1(b)(2)(A)(i). *Id.* at 7.

The district court resolved one last Guidelines dispute (not pertinent on appeal) in defendant's favor. Specifically, the court sustained defendant's challenge to a four-level enhancement under Guideline § 3B1.1(a) for acting as an organizer or leader of criminal activity that involved five or more participants—which had been advanced in the PSR and adopted by the government. PSR ¶ 30; R. 72 at 5-6; G. App. 7. The court determined that a three-level enhancement under Guideline § 3B1.1(b), based on defendant's actions being consistent with a manager or supervisor of criminal activity, was warranted instead. G. App. 7-8.

Having resolved these Guidelines disputes, the district court calculated defendant's total offense level to be 35, and when coupled with a criminal history category of I, determined his advisory Guidelines range to be 168 to 210 months' imprisonment. G. App. 8. The district court went on to impose a below-Guidelines term of imprisonment of 100 months. *Id.* at 32.[4]

---

[4] Had the district court calculated defendant's Guidelines range using only actual loss, the advisory range would have been 108 to 135 months' imprisonment. Had the district court also declined to impose the two-level enhancement under Guideline § 2B1.1(b)(2)(A)(i), the advisory range would have been 87 to 108 months' imprisonment.

In so doing, the district court emphasized the seriousness of the offense, including the fact that defendant used the proceeds of his crime to "liv[e] the high life," as well as the need to promote general deterrence and respect for the law. G. App. 28-32. At the same time, the district court recognized several mitigating factors, including defendant's efforts to pay restitution to his victims and defendant's representations that he had been tortured by foreign authorities after being arrested. *Id.* Finally, in imposing its sentence, the district court emphasized: "I think the 3553(a) factors are more important here, very frankly, than the guidelines." *Id.* at 9.

## SUMMARY OF ARGUMENT

The district court did not err in calculating defendant's Guidelines range; its judgment therefore should be affirmed.

First, the district court did not err in calculating defendant's Guidelines range using intended loss rather than actual loss. The district court's calculations were consistent with this Court's precedent applying *Stinson v. United States*, 508 U.S. 36 (1993), both before and after the Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). The district court's decision is also consistent with *Kisor* itself. The text of Guideline § 2B1.1(b), coupled with that provision's purpose, history, and structure, supports the conclusion that the term "loss" is genuinely ambiguous—or at least not plainly limited to "actual loss." As a result, the district court properly deferred to the Guidelines

commentary and, in particular, Application Note 3(A) to Guideline § 2B1.1, defining loss as the greater of actual loss or intended loss.

Second, the district court did not err in finding that defendant's offense conduct involved at least 10 victims and thus warranted a two-level enhancement under Guideline § 2B1.1(b)(2)(A). Defendant conceded personally using the means of identification (namely, email credentials) of well over 10 individuals to commit fraud and obtain money. The district court thus did not err in treating these individuals as victims of defendant's fraud scheme and calculating defendant's Guidelines range accordingly.

Finally, even if the district court improperly calculated defendant's Guidelines range, any such error would be harmless because the district court explained that the 18 U.S.C. § 3553(a) factors, not the Guidelines, were the driving factor behind defendant's sentence.

## ARGUMENT

## I.    The District Court Did Not Err in Calculating Defendant's Guidelines Range Using Intended Loss.

### A.    Standard of Review

This Court "review[s] legal interpretations of the Sentencing Guidelines de novo and factual findings as to loss for amount for clear error." *See United States v. Griffin*, 76 F.4th 724, 745 (7th Cir. 2023).

**B.    Analysis**

The Sentencing Guidelines provide that, for fraud crimes, a defendant's offense level should be increased according to the amount of "loss" resulting from the offense. *Id.* (citing U.S.S.G. § 2B1.1(b)). Application Note 3(A) to Guideline § 2B1.1 instructs that "loss is the greater of actual or intended loss." U.S.S.G. § 2B1.1, cmt. n.3(A). Consistent with that application note, the district court here did not err by calculating defendant's Guidelines range using intended, not actual, loss.

### 1.    This Court's Precedent Directs Sentencing Courts to Consider Intended Loss When Calculating a Defendant's Guidelines Range.

This Court repeatedly has affirmed the use of intended loss—meaning, "the pecuniary harm that the defendant purposely sought to inflict," even if that harm "would have been impossible or unlikely to occur"—when calculating loss amounts in fraud cases. *See* U.S.S.G. § 2B1.1, cmt. n.3(A)(ii); *United States v. Elizondo*, 21 F.4th 453, 473 (7th Cir. 2021); *United States v. Blake*, 965 F.3d 554, 559 (7th Cir. 2020). It has explained that "[i]ntended loss, if it can be determined, is applied in fraud causes because the actual amount of money or property obtained generally understates the true financial loss." *See United States v. Mei*, 315 F.3d 788, 792 (7th Cir. 2003).

Circuit precedent notwithstanding, defendant argues that following the Supreme Court's opinion in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), sentencing

courts are limited to using "actual loss"—that is, "the reasonably foreseeable pecuniary harm that resulted from the offense"—when calculating a defendant's offense level under Guideline § 2B1.1. Br. 7-9; U.S.S.G. § 2B1.1, cmt. n.3(A)(i). Defendant's argument lacks merit, as the district court's application of the offense-level enhancement here fully comports with this Court's pre- and post-*Kisor* precedent applying *Stinson v. United States*, 508 U.S. 36 (1993), and with *Kisor* itself.

In *Stinson*, the Supreme Court addressed the role of Guidelines commentary and determined that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Id.* at 38. In making that determination, *Stinson* drew an "analogy" to the principles of deference applicable to an executive agency's interpretation of its own regulations. *Id.* at 44. *Stinson* stated that, under those principles, as long as the "agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Id.* at 45 (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). *Stinson* acknowledged that the analogy between an agency's interpretation of its own regulations and the Guidelines commentary was "not

13

precise," but nonetheless viewed affording "this measure of controlling authority to the commentary" as the appropriate approach. *Id.* at 44-45.

In *Kisor*, the Supreme Court considered whether to overrule *Seminole Rock* and *Auer v. Robbins*, 519 U.S. 452 (1997), and thus "discard[] the deference" afforded under those decisions to "agencies' reasonable readings of genuinely ambiguous regulations." 139 S. Ct. at 2408; *see Auer*, 519 U.S. at 461 (stating that an agency's interpretation of its own regulation is "controlling unless 'plainly erroneous or inconsistent with the regulation'") (quoting, indirectly, *Seminole Rock*, 325 U.S. at 414). Instead, the Supreme Court used *Kisor* as an opportunity to "restate, and somewhat expand on," the limiting principles for deferring to agency's interpretation of its own regulation. 139 S. Ct. at 2414. Among other things, *Kisor* held that "a court should not afford *Auer* deference" to an agency's interpretation of a regulation "unless the regulation is genuinely ambiguous." Id. at 2415.

Importantly, *Kisor* pointedly declined to overrule *Auer* or *Seminole Rock*—let alone the "legion" of other precedents applying those decisions, including *Stinson*. *Kisor*, 139 S. Ct. at 2411 n.3 (opinion of Kagan, J.) (identifying *Stinson*, 508 U.S. at 44-45, as one of numerous examples); *see id.* at 2422 (majority opinion) (citing this "long line of precedents" as a reason not to overrule *Auer*) (citation omitted); *cf. id.* at 2424-25 (Roberts, C.J., concurring in part). *Kisor* explained that it had "applied *Auer* or *Seminole Rock* in dozens

14

of cases, and lower courts ha[d] done so thousands of times," and that "[d]eference to reasonable agency interpretations of ambiguous rules pervades the whole corpus of administrative law." *Id.* at 2422 (majority opinion). And the Court adhered to *Auer* on stare decisis grounds in part to avoid "allow[ing] relitigation of any decision based on *Auer*," with the attendant "instability" that would result from overturning precedent in "so many areas of law, all in one blow." *Id.*

As already noted, *Stinson* reasoned that—by "analogy," albeit "not [a] precise" one—the Sentencing Commission's commentary interpreting the Guidelines should be treated the same as an executive agency's interpretation of a regulation. 508 U.S. at 44; *see also id.* at 44-46. Where *Kisor* now provides the governing standards for determining whether a court must defer to an executive agency's interpretation of a regulation (*see* 139 S. Ct. at 2414-18), the government has taken the position in other cases that *Kisor* sets forth the authoritative standards for determining whether particular Guidelines commentary is entitled to deference. *See, e.g.*, *Ratzloff v. United States*, No. 23-310, Br. for the United States in Opp'n to Pet. for Cert., 2023 WL 8481953, at *14 (Dec. 6, 2023); *Moses v. United States*, No. 22-163, Br. for the United States in Opp'n to Pet. for Cert., 2022 WL 17155762, at *14-15 (Nov. 21, 2022).

Post-*Kisor*, this Court has continued to rely on *Stinson* when deciding whether and when to defer to Guidelines commentary, without commenting

whether, or to what extent, that precedent may have been affected by *Kisor*. *See, e.g.*, *United States v. Lomax*, 51 F.4th 222, 228-29 (7th Cir. 2022) (deferring to Guideline § 4B1.2's Application Note 1 to conclude that a "crime of violence" includes inchoate offenses and relying on *Stinson* as part of that analysis); *United States v. Smith*, 989 F.3d 575, 584-85 (7th Cir. 2021) (same with respect to the term "controlled substance offense"); *United States v. Adams*, 934 F.3d 720, 727-30 (7th Cir. 2019) (same).

Relatedly, two courts of appeals have specifically concluded that *Stinson* remains unaffected by *Kisor*. For instance, the Fifth Circuit, sitting *en banc*, explained that "[i]nferior courts must follow directly applicable Supreme Court precedent that has not been overruled or modified"; that "*Stinson* squarely applies" to the question of whether courts can rely on Guidelines commentary to interpret § 4B1.2's definition of "controlled substance offense"; and that *Stinson* "has not been overruled or modified" by *Kisor*. *See United States v. Vargas*, 74 F.4th 673, 680 (5th Cir. 2023). *Vargas* thus concluded: "So, follow [*Stinson*] we must." *Id.*; *see also id.* at 680-83. The Tenth Circuit has held similarly. It has explained that "*Kisor* did not abrogate *Stinson*"; that "[c]ommentary governs unless it 'runs afoul of the Constitution or a federal statute' or is plainly erroneous or inconsistent' with the guideline provision it interprets"; and that it would not "extend *Kisor* to the Commission's commentary absent clear direction from the [Supreme] Court." *See United*

16

*States v. Maloid*, 71 F.4th 795, 798, 805, 807 (10th Cir. 2023). *Maloid* went on to hold that the district court did not plainly err in concluding that, in light of the Guidelines commentary, a "crime of violence" under the Guidelines includes a conspiracy to commit those crimes. *Id.* at 813-14.[5]

However, other federal appeals courts have concluded differently, taking the view that *Kisor* limited the circumstances under which deference is properly given to Sentencing Guidelines commentary. *See, e.g.*, *United States v. Castillo*, 69 F.4th 648, 651 (9th Cir. 2023) (applying the *Kisor* framework to question of deference to Guidelines commentary); *United States v. Dupree*, 57 F.4th 1269, 1275 (11th Cir. 2023) (en banc) (same); *United States v. Riccardi*, 989 F.3d 476, 485 (6th Cir. 2021) (same); *United States v. Nasir*, 17 F.4th 459, 471 (3d Cir. 2021) (en banc) (same).

In any event, as explained next, whether or not *Kisor* is understood as modifying *Stinson*, Application Note 3(A) to Guideline § 2B1.1 continues to

---

[5] *See also United States v. Moses*, 23 F.4th 347, 349 (4th Cir. 2022), *cert. denied* 143 S. Ct. 640 (2023) ("*Stinson* continues to apply unaltered by *Kisor*."); *United States v. Limbaugh*, No. 21-4449, 2023 WL 119577, at *4 (4th Cir. Jan. 6, 2023) (in the context of plain-error review, noting that "[t]o date, neither the Supreme Court nor this circuit has addressed . . . whether the commentary defining 'loss' in Application Note[] 3(A) . . . can be reconciled with the text of § 2B1.1's 'loss' provision"). *But see United States v. Campbell*, 22 F.4th 438, 445 & n.3 (4th Cir. 2022) (concluding, 12 days before *Moses*, that "although in *Kisor* the Supreme Court refused to jettison *Seminole Rock/Auer* deference entirely," *Kisor* explicitly "reinforced the limits of the doctrine, substantially cabining the circumstances under which courts defer to agencies' interpretations of their own rules," and noting that these "modifications . . . apply equally to judicial interpretations of the Sentencing Commission's commentary").

warrant deference. The district court therefore did not err in relying on that application note's directive that "loss is the greater of actual loss or intended loss" when calculating defendant's Guidelines range.

## 2. The District Court Did Not Err in Calculating Defendant's Guidelines Range Based on Intended Loss.

In *Kisor*, the Supreme Court described the circumstances under which courts should defer to an agency's interpretation of its own regulations. *Kisor* explained that, first, courts should defer to an agency's interpretation only if "the regulation is genuinely ambiguous . . . [after] exhaust[ing] all the 'traditional tools' of construction," including analyzing the regulation's "text, structure, history, and purpose." 139 S. Ct. at 2415. Second, the agency's reading must fall "within the bounds of reasonable interpretation." *Id.* at 2416. Finally, the regulatory interpretation must be the agency's "authoritative" or "official position"; it must implicate the agency's "substantive expertise"; and it must reflect the agency's "fair and considered judgment," rather than a "convenient litigating position," a "*post hoc* rationalization advanced" to "defend past agency action against attack," or a "new interpretation . . . that creates 'unfair surprise' to regulated parties." *Id.* at 2416-18.

Guideline § 2B1.1's use of the term "loss" and Application Note 3(A) satisfy these criteria.

### a. Under Guideline § 2B1.1, "Loss" Is Not Unambiguously Limited to "Actual Loss."

"Loss," as used in Guideline § 2B1.1, is genuinely ambiguous—or at least not plainly limited to "actual loss." In *Kisor*, the Supreme Court described genuine ambiguity as encompassing circumstances where "uncertainty" as to the meaning of a regulation exists, or where there is more than "one reasonable construction of a regulation." 139 S. Ct. at 2415. Where the word "loss" is plainly susceptible to different meanings—as discussed next and as at least two federal appeals courts have found—such uncertainty exists, leading to more than one reasonable construction of Guideline § 2B1.1. The structure, history, and purpose of § 2B1.1 further underscore that point.

Section 2B1.1 does not define "loss." This Court thus presumes that the term carries its ordinary meaning, which "dictionaries can at times be helpful to determine." *See United States v. LaFaive*, 618 F.3d 613, 616 (7th Cir. 2010); *United States v. Turchen*, 187 F.3d 735, 739 (7th Cir. 1999) (district court "quite properly consulted" dictionary definitions of term not defined in the Guidelines and without "an established common-law meaning" to give the term "its ordinary meaning"). A survey of dictionaries confirms that "loss" can have a range of meanings. "Loss" can mean the "amount of something lost" or the "harm or suffering caused by losing or being lost." *American Heritage Dictionary of the English Language* 1063 (3d ed. 1992). Loss also can mean the

"[d]imunition of one's possessions or advantages" or the "detriment or disadvantage involved in being deprived of something." *Oxford English Dictionary* 37 (2d ed. 1989). It can mean "[a]n undesirable outcome of a risk," "the disappearance or diminution of value," or the "failure to maintain possession of a thing." *Loss*, *Black's Law Dictionary* (11th ed. 2019). Perhaps most significantly for the question presented here, Black's Law Dictionary explains that loss may refer to anything from "actual loss" to "expectation loss" to "indirect loss" to "intangible loss" and even "unrealized loss." *Id.*

Given this range of definitions, in *Riccardi*, the Sixth Circuit recognized that "'loss' means different things in different contexts," thus signaling genuine ambiguity under *Kisor*. 989 F.3d at 486. *Riccardi* explained:

> The word might include emotional harms, as in the statement that the children "bore up bravely under the [loss] of both parents[.]" *Webster's Third New International Dictionary* 1338 (1986). Or it might include just economic harms, as in the statement that my friend was "forced to sell all the stock at a [loss]." *Id.* . . . Even in the economic realm, the word might cover only the precise value of, say, a gift card that is stolen (the "amount of something lost"). *American Heritage Dictionary*, *supra*, at 1063. Or it might include the costs associated with obtaining a replacement gift card, including the time and expense from a second trip to the store ("the damage, trouble, disadvantage, [or] deprivation . . . caused by losing something"). *Webster's New World College Dictionary*, *supra*, at 799.

*Id.* at 486. The Ninth Circuit acknowledged the same opacity in light of the dictionary definitions assembled in *Riccardi*. *See United States v. Kirilyuk*, 29 F.4th 1128, 1137-38 (9th Cir. 2022) ("'[L]oss' can have a range of meanings.").

This Court likewise has reasoned: "The existence of alternative dictionary definitions of a word, each making some sense under the statute, itself indicate[s] that the statute is open to interpretation and the word is ambiguous as between the two meanings." *See Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 233 F.3d 981, 989 (7th Cir. 2000); *see also Kisor*, 139 S. Ct. at 2410-11 (collecting cases where courts have concluded that seemingly ordinary terms like "lines of sight"; "liquids, gels, and aerosols"; "diagnosis"; and "salary basis" have "create[d] real uncertainties about a regulation's meaning"). In short, the existence of various, ordinary meanings of the term "loss" undermine the argument that, for purposes of the Guidelines, the term is unambiguously limited to actual loss.

The purpose, history, and structure of Guideline § 2B1.1 further support that conclusion. *See Kisor*, 139 S. Ct. at 2415; *see also United States v. Phillips*, 54 F.4th 374, 382-83 (6th Cir. 2022) (explaining that under *Stinson* and *Kisor*, courts "*must* carefully consider" these factors and noting that courts "commonly look at the broader context in which the term at issue has been used and have expressly done so in interpreting the words of the Sentencing Commission") (emphasis in original).

With respect to purpose, Guideline § 2B1.1 covers a wide range of criminal conduct and, in so doing, a wide range of harm, including intended harm. More specifically, § 2B1.1 covers "offenses involving theft, stolen

property, property damage or destruction, fraud, forgery, and counterfeiting" and, in tandem, a large number of federal fraud statutes that "often are broadly written" and that "cover a broad range of conduct with extreme variation in severity." U.S.S.G. § 2B1.1, cmt. background. "[W]ith these considerations in mind," the Sentencing Commission explained, a fraud defendant's sentence should "reflect the nature and magnitude of the loss *caused or intended by their crimes*," thus "serv[ing] as a measure of the seriousness of the offense and the defendant's relative culpability." *Id.* (emphasis added). An interpretation of the word "loss" limited only to "actual loss" cannot possibly cover a purpose this expansive and circumstances so wide-ranging.[6]

With respect to history, the Guidelines originally included intended loss in the text of fraud provisions, thus serving as another indication that § 2B1.1's reference to "loss" is not plainly limited to actual loss. *See* U.S.S.G. § 2F1.1(b)(1) (1987) (providing for an increased offense level in fraud offenses based on "estimated, probable or intended loss"). In November 2001, the

---

[6] In addition, per the Guidelines commentary, loss may or may not include certain expenses, *see* U.S.S.G. § 2B1.1, cmt. n.3(D) (excluding incurred costs, such as interest, fees, penalties, and costs of prosecution), and certain items may be credited against loss, *see id.*, cmt. n.3(E) (crediting money repaid to or recouped by the victim). The commentary also identifies, and excludes, other types of loss, such as emotional distress, harm to reputation, and other non-economic harms. *Id.*, cmt. n.3(A)(iii). These exclusions and credits—which often inure to the benefit of defendants by reducing the amount of loss, both actual and intended, for which they might otherwise be accountable—further illustrate the existence of multiple possible meanings of the term "loss."

Commission promulgated a "new definition of loss applicable to offenses previously sentenced under" several different Guideline sections, including § 2F1.1. U.S.S.G. App. C, Vol. II, at 176 (Amend. 617). Although it moved "intended loss" to the commentary, the Commission made clear that the amendment did not disrupt any continuity in approach. It explained: "[T]he new definition of loss retains the core rule that loss is the greater of actual and intended loss." *Id.* This history thus supports a reading of "loss" that is not unambiguously limited to "actual loss"; it demonstrates that there is another "reasonable construction of the regulation." *Kisor*, 139 S. Ct. at 2415.

The Guidelines' structure points in the same direction. Under the Guidelines, courts calculate a defendant's advisory range based on his offense conduct and his relevant conduct. *See* U.S.S.G. § 1B1.3. Relevant conduct encompasses "all harm that resulted from the acts and omissions [committed by the defendant or, in cases of jointly undertaken criminal activity, by the defendant in concert with others], and *all harm that was the object of such acts and omissions*." *Id.* at § 1B1.3(a)(3) (emphasis added).[7] As used in the

---

[7] The language of Guideline § 1B1.3(a)(3) is not part of the Guidelines commentary, but "a guideline provision itself." *See Stinson*, 508 U.S. at 41 (noting that the Guidelines Manual "contains text of three varieties," namely, the Guideline provisions themselves, policy statements, and the commentary). Whereas Guideline commentary is not binding in all instances, sentencing courts are bound to apply pertinent Guideline provisions when calculating a defendant's Guidelines range. *Id.* at 42.

Guidelines, "the phrase 'the object of an offense'" means "the attempted or intended loss, rather than the actual loss." *United States v. Black*, 815 F.3d 1048, 1052 (7th Cir. 2016) (quoting *United States v. Chavin*, 316 F.3d 666, 677 (7th Cir. 2002)). "Object," after all, refers to the "goal, purpose, or aim" of a course of action. *See Oxford English Dictionary Online*, https://www.oed.com/view/Entry/129613. And the goal, purpose, or aim of a defendant's acts or omissions is not distinguishable from his intent. *See Voisine v. United States*, 579 U.S. 686, 691-92 (2016) (a person acts "intentionally" with respect to an action when he "ha[s] that result as a 'conscious object'"). Thus, the structure of the Guidelines—designed as they are to marshal the full range of a defendant's conduct at sentencing—reinforces the conclusion that "loss," in this context, is not unambiguously limited to actual loss.

Another Guidelines provision, § 2B1.4, supports this point. Section 2B1.4 measures culpability in terms of "gain" and adds offense levels in two-level increments based on the table in § 2B1.1(b)(1). But unlike § 2B1.1, § 2B1.4 cabins "gain" with an important qualifier: the gain must "result[] from the offense." U.S.S.G. § 2B1.4(b)(1). In other words, in the context of determining gain, § 2B1.4 explicitly rebuts the presumption set forth in § 1B1.3—that harm includes actual *and* intended harms. Under § 2B1.4, only actual gains matter; "uncertainty does not exist." *Kisor*, 139 S. Ct. at 2415. The language of Section 2B1.1 does not similarly exempt that section from the relevant harm provision,

thus underscoring that § 2B1.1's reference to "loss" cannot be read as unmistakably limited to actual loss.[8]

Defendant resists this conclusion, arguing that while dictionaries may offer competing definitions of the word, "the varying definitions of 'loss' have in common the element of 'concrete materialization of harm'—that is, 'harm that actually occurred.'" Br. 8-9. Defendant finds support in *United States v. Banks*, where the Third Circuit reviewed "common dictionary definitions" and

---

[8] If this Court were to conclude that "loss" is not genuinely ambiguous for purposes of § 2B1.1, the reasonable conclusion would be that "loss" unambiguously includes— rather than excludes—"intended loss" under that Guideline. The Court thus could affirm the district court's calculation without affording any deference to the Guidelines commentary. *See e.g., United States v. Reaves*, 796 F.3d 738, 742 (7th Cir. 2015) (observing that a court of appeals "may affirm the judgment of the district court on any ground supported in the record") (citing *United States v. Taylor*, 627 F.3d 674, 676 (7th Cir. 2010)). Such an interpretation would be well-supported by the ordinary meaning of "loss," which as noted earlier, can be defined as including unrealized loss. *Loss, Black's Law Dictionary* (11th ed. 2019). It also would be well-supported by the Guidelines' structure, which penalizes defendants for all harm "that was the object of" their criminal acts (U.S.S.G. § 1B1.3(a)(3)), and the Guidelines' purpose, which is to devise sentences for fraud offenses that "reflect the nature and magnitude of the loss caused or intended by their crimes" (U.S.S.G. § 2B1.1, cmt. background). Finally, it would be well-supported by the Guidelines' history, which originally included intended loss in the text of fraud provisions. *See* U.S.S.G. § 2F1.1(b)(1) (1987) (providing for an increased offense level in fraud offenses based on "estimated, probable or intended loss").

held that "the ordinary meaning of the word 'loss' is the loss the victim actually suffered." 55 F.4th 246, 257-58 (3d Cir. 2022).[9]

But *Banks'* reasoning is unpersuasive. *Banks* glossed over key differences in the dictionary definitions to which it cited and concluded, with scant explanation, that these definitions "point to an ordinary meaning of 'actual loss.'" *Id. Banks* even acknowledged that, "*in context*, 'loss' could mean pecuniary or non-pecuniary loss and could mean actual or intended loss." *Id.* (emphasis added). Yet *Banks* did not explain why the term "loss" was unambiguously limited to actual loss, particularly in light of that Guideline provision's history, purpose, and structure of § 2B1.1. Perhaps most glaringly, *Banks* never addressed the interaction between § 1B1.3 and § 2B1.1. Instead,

---

[9] Defendant also cites *United States v. Alford*, No. 3:21CR052, 2022 WL 3577373 (N.D. Fla. Aug. 20, 2022), for support. Br. 8-9. That decision was vacated two days later, with the district court overruling the defendant's objection to the use of "intended loss" to calculate his Guidelines range. See *United States v. Alford*, 3:21CR052, 2022 WL 19406808 (N.D. Fla. Aug. 22, 2022).

its analysis was reduced to the assumption that because § 2B1.1 covers "basic economic offenses," loss presumptively was limited to actual loss. *Id*.[10]

Defendant further argues that under the rule of lenity, the district court erred in not calculating his Guidelines using only actual loss. The rule of lenity applies "when, after consulting traditional canons of statutory construction, [courts] are left with an ambiguous statute . . . such that the Court must simply guess as to what Congress intended." *See United States v. Pace*, 48 F.4th 741, 755 (7th Cir. 2022) (quoting *United States v. Shabani*, 513 U.S. 10, 17 (1994), and *Maracich v. Spears*, 570 U.S. 48, 76 (2013)) (internal quotation marks omitted). Under *Kisor*, however, where there is genuine ambiguity in the text of the Guidelines, district courts are to consult the Guidelines commentary; they are not left to "simply guess" as to what the Sentencing Commission

---

[10] In response to *Banks*, on December 14, 2023, the Sentencing Commission proposed an amendment to § 2B1.1 "to ensure consistent loss calculation across circuits." *See* Proposed Amendments to the Sentencing Guidelines (Preliminary), at 1-2 (Dec. 14, 2023), *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20231214_prelim-RF-proposed.pdf (last visited Jan. 5, 2024). The proposed amendment would create Notes to the loss table in §2B1.1(b)(1) and move the general rule establishing loss as the greater of actual loss or intended loss from the commentary to the guideline itself as part of those Notes. *Id*. at 2-11. The proposed amendment also would move the rule providing for the use of gain as an alternative measure of loss, as well as the definitions of "actual loss," "intended loss," "pecuniary harm," and "reasonably foreseeable pecuniary harm" from the commentary to the Notes. *Id*. This proposed amendment is presently subject to a public comment period running through February 22, 2024.

27

intended. *Kisor*, 139 S. Ct. at 2415. In this case, such consultation leads to using intended loss to calculate defendant's Guidelines range.

### b. Application Note 3(A) Satisfies the Remaining Criteria Warranting Deference Under *Kisor*.

Defendant does not contest that Application Note 3(A) satisfies the remaining criteria set forth in *Kisor*: that the agency's interpretation fall "within the bounds of reasonable interpretation"; be the agency's "authoritative" or "official position"; implicate the agency's "substantive expertise"; and reflect the agency's "fair and considered judgment." *Kisor*, 139 S. Ct. at 2416-18.

First, Application Note 3(A)'s inclusion of "intended loss" provides a reasonable interpretation of the term "loss." *Kisor*, 139 S. Ct. at 2415-16. As noted above, the Sentencing Commission found that economic crime statutes generally "cover a broad range of conduct with extreme variation in severity." U.S.S.G. § 2B1.1, cmt. (background). The Commission accordingly uses loss as a "principal factor" in determining the appropriate offense level according to the seriousness of the offense and "defendant's relative culpability." *Id*. In these circumstances, the Commission reasonably defined "loss" to mean "the greater of actual loss or intended loss," as it has since the Guidelines were first issued, in order to align the offense level with the loss the defendant intended to inflict.

28

A contrary interpretation would disparately impact defendants with similar culpability based solely on whether their scheme was thwarted in time to prevent actual losses. For example, a defendant who unsuccessfully executes a billion-dollar health care fraud scheme would face a Guidelines range as low as zero to six months of imprisonment, while a defendant whose scheme succeeded would receive a minimum recommended sentence of eight to ten years. *See* U.S.S.G. § 2B1.1(a)(1), (b)(1) (providing a base offense level of 7 for an offense with no loss, and a 30-level enhancement for a loss of more than $550 million). As this Court explained in *Mei*: "[T]he purpose of fraud statutes . . . is to punish the scheme, not simply the unlawful taking of money or property." 315 F.3d at 792 (adding that, based on the facts there, "the fraud would have been complete even if [the defendant] had not used the [counterfeit credit] card"). Where the purpose of calculating "loss" is to treat defendants of similar culpability in a similar way, an interpretation that leads to such disproportionate results—i.e., where loss can only mean actual loss—cannot be the only reasonable interpretation of the term.

In addition, Application Note 3(A)'s definition of "loss" unquestionably reflects the Commission's "authoritative" and "official" position. *Kisor*, 139 S. Ct. at 2416 (internal quotation marks omitted). The Sentencing Guidelines use "loss" in a specialized sense. The purpose of estimating "loss" is to assess "the seriousness of the offense and the defendant's relative culpability." U.S.S.G.

§ 2B1.1, cmt. (background); *see id.* App. C Supp., at 104-05 (Amend. 793) (noting "the Commission's continued belief that intended loss is an important factor" because it focuses "specifically on the defendant's culpability"); *id.* App. C, Vol. II, at 177 (Amend. 617) (same). Accordingly, and as noted earlier, the Commission has included intended loss in the Guidelines since their inception. *See* U.S.S.G. § 2F1.1(b)(1) (1987) (providing for an increased offense level in fraud offenses based on "estimated, probable or intended loss").

The commentary thus implicates the Commission's substantive expertise. As the Supreme Court explained in *Mistretta v. United States*, 488 U.S. 361, 379 (1989): "Developing proportionate penalties for hundreds of different crimes by a virtually limitless array of offenders is precisely the sort of intricate, labor-intensive task for which delegation to an expert body is especially appropriate." *See also Stinson*, 508 U.S. at 45 (the Commission's commentary "assist[s] in the interpretation and application of [the guidelines], which are within the Commission's particular area of concern and expertise and which the Commission itself has the first responsibility to formulate and announce"). Finally, the commentary reflects the Commission's "fair and considered judgment," not an ad hoc position of convenience for litigation advantage. *Kisor*, 139 S. Ct. at 2417-18 (internal quotation marks omitted).

For these reasons as well, the district court properly deferred to Application Note 3(A) when calculating the loss associated with defendant's scheme.

## II.     The District Court Did Not Err in Calculating Defendant's Guidelines Range After Applying a Two-Level Enhancement Under Guideline § 2B1.1(b)(2)(A).

### A.     Standard of Review

As noted earlier, this Court "review[s] legal interpretations of the Sentencing Guidelines de novo and factual findings . . . for clear error." *See Griffin*, 76 F.4th at 745.

### B.     Analysis

Under Guideline § 2B1.1(b)(2)(A), if an offense involves 10 or more victims, the offense level is to be increased by two levels. Under Application Note 1 to Guideline § 2B1.1(b)(2)(A), "victim" is defined as "any person who sustained any part of the actual loss determined under [Guideline § 2B1.1(b)(1)]." Defendant argues that because only seven victim companies suffered actual loss as part of his business email compromise scheme, the district court erred in imposing this enhancement. Br. 10-11.

Defendant's argument lacks merit. The district court did not impose the enhancement under Guideline § 2B1.1(b)(2)(A) because 12 victim companies suffered actual and intended losses as a result of his business email compromise scheme. Instead, the district court imposed the enhancement

because defendant separately acknowledged personally using the means of identification (namely, email credentials) of well over 10 individuals to commit fraud and obtain money from those individuals. G. App. 5-7; *see also id.* at 6 (government notes that defendant has "acknowledged that he personally gained unauthorized access to over 300 accounts and for approximately 100 of those made some money off of it"); PSR ¶¶ 10, 26; R. 73 at 1.

In his opening brief, defendant does not dispute that these facts justified the two-level enhancement, and so any such argument has been waived. *See United States v. Alhalabi*, 443 F.3d 605, 611 (7th Cir. 2006). On the merits, defendant's argument still would be unsuccessful where, per his own concessions, he stole funds from approximately 100 accounts to which he obtained unauthorized access and used the means of identification of more than 300 accounts. On that latter point, Application Note 1 to Guideline § 2B1.1 gives "means of identification" the meaning set forth in 18 U.S.C. § 1028(d)(7), which includes access devices, such as email addresses and passwords. *See also* 18 U.S.C. § 1029(e)(1). Thus, any of the individuals whose credentials were compromised by defendant (or his co-schemers) were properly considered victims for purposes of Guideline § 2B1.1(b)(2)(A), and the district court therefore did not err in calculating defendant's Guidelines range using the two-level enhancement in that Guideline.

### III.   In Any Event, Any Guidelines-Calculations Error Was Harmless Where the District Court Selected Defendant's Sentence Based on the § 3553(a) Factors.

Not all procedural errors require resentencing. *See United States v. Durham*, 967 F.3d 575, 579 (7th Cir. 2020). "[A]ny error in calculating a total offense level is harmless when the district court makes clear that—considering the factors under 18 U.S.C. § 3553(a)—it would have imposed the same sentence even if [this Court] were to conclude it had incorrectly calculated the Guidelines range." *United States v. Lovies*, 16 F.4th 493, 508 (7th Cir. 2021) (citing *United States v. Alvarez-Carvajal*, 2 F.4th 688, 693 (7th Cir. 2021)); *see also United States v. Baker*, 56 F.4th 1128, 1132 (7th Cir. 2023) ("A guideline error can be harmless if we can tell from the record that on remand, considering the different and arguably proper guideline level, the judge would impose the same sentence."); *United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009) ("To prove harmless error, the government must be able to show that the Guidelines error did not affect the district court's selection of the sentence imposed.") (cleaned up).

That is the case here. After the district court resolved the parties' three Guidelines disputes, counsel for defendant sought clarity "for the record" that the court had overruled two of defendant's objections. G. App. 9. In response, the district court provided that clarity, but then added: "Just to make it perfectly clear, the findings I am making on the guideline issue, *I think the*

*3553(a) factors are more important here, very frankly, than the guidelines.*" *Id.* (emphasis added). The court then went on the hear extensive argument on the § 3553(a) factors. *See id.* at 10-28. In ultimately imposing a below-Guidelines 100-month term of imprisonment, the court justified that sentence by comprehensively referencing those factors, including the seriousness of the offense, defendant's decision to use the proceeds of his crime to "liv[e] the high life," the need to promote general deterrence and respect for the law, and several mitigating factors such as defendant's efforts to pay restitution to his victims and defendant's representations that he had been tortured by foreign authorities after being arrested. *Id.* at 28-32.

Admittedly, the district court did not explicitly state that it would have imposed the same sentence even if it had calculated defendant's Guidelines range using only actual loss. *Contra Abbas,* 560 F.3d at 667 ("[W]e note that our harmless error determination is simplified by the fact that the sentencing judge expressly stated that she would have imposed the same sentence even if § 2C1.1 did not apply to the defendant's sentence."). Nevertheless, where the district court "ma[d]e it perfectly clear" that "the 3553(a) factors are more important here, very frankly, than the guidelines," this Court may affirm defendant's sentence on harmless-error grounds.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court affirm the judgment of the district court.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

/s/ *Georgia N. Alexakis*
GEORGIA N. ALEXAKIS
MELODY LAKE WELLS
Assistant United States Attorneys

35

## RULE 32 CERTIFICATION

I hereby certify that:

1.  This brief complies with the type volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains 8,087 words.

2.  This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Office Word proportionally-spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:      /s/ *Georgia N. Alexakis*
         GEORGIA N. ALEXAKIS
         Assistant United States Attorney
         219 South Dearborn Street, 5th Floor
         Chicago, Illinois
         (312) 353-5300

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2024, I electronically filed the foregoing Brief of the United States with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted.

By:    /s/ *Georgia N. Alexakis*
GEORGIA N. ALEXAKIS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 353-5300